IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37383-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| HOWARD LEE NORTON, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Howard Norton appeals his conviction and sentence for two counts

of second degree assault and two counts of malicious harassment. Each conviction

carried a firearm-related sentencing enhancement. We affirm the convictions and

sentence.

FACTS

This prosecution arises from shots fired one evening at the Thirsty Dog tavern.

The State alleges that Howard Norton fired the shots with racial malice. Since Norton

challenges the sufficiency of evidence for his convictions, we take the facts in a light

favorable to the State.

Howard Norton patronized the Thirsty Dog several times a week. The gregarious

Norton enjoyed talking with other customers. On March 11, 2019, Norton drank

whiskey, not his usual drink, at the tavern. Bartender Candace Guzman estimated that Norton drank three whiskeys over six hours.

On March 11, 2019, Ahnonymas Walker and his friend, Carmen Flemming, both black men, entered the Thirsty Dog at 9:30 p.m. to play pool and consume beer. Walker and Flemming often socialize at the Thirsty Dog. While sitting at the bar, the duo saw an unfamiliar man and a woman to their right. The man, defendant Howard Norton, wore a cowboy hat. Norton did not know Walker or Flemming.

Howard Norton engaged Ahnonymas Walker in conversation. Norton asked Walker where the latter worked. Walker responded that he worked in WinCo's produce department. Norton replied that Walker was an ignorant, "effing" liar. Report of Proceedings (RP) (Jan. 14, 2020) at 145. Walker retorted that, if Norton did not believe his story, Norton should go to the produce apartment at 2 p.m. the following day, when he would be working. In reply, Norton called Walker ignorant and a "lying sack of shit." RP (Jan. 14, 2020) at 146. Walker and Norton exchanged further brickbats.

Carmen Flemming overheard the unorthodox conversation between his friend Ahnonymas Walker and Howard Norton. Flemming attributed Norton's behavior to alcohol consumption. After Walker called both men ignorant, Flemming entered the colloquy. Flemming called Norton a crackhead. The bartender, Candace Guzman, heard the heated exchange and told all three men to relax. According to Norton, Flemming thereafter lobbied insults such as "stupid, old cowboy." RP (Jan. 15, 2020) at 393.

Norton averred that Flemming threatened to "F me up." RP (Jan. 15, 2020) at 396.

Norton told Flemming: "I said it's pretty plain to see who is the moron here, because you

can't say a full sentence without throwing that F word in at least two or three times, you

can't say one sentence." RP (Jan. 15, 2020) at 394.

Ahnonymas Walker retired to the gentlemen's room. Howard Norton left the bar.

According to Norton, he left intending to procure his wallet from his car in order to pay

for food he had ordered to go. Norton returned after fifteen minutes to his original seat

with his food and bill awaiting him. He bore not only his wallet, but a gun. Walker

noticed a smirk on Norton's face, and Walker told Carmen Flemming to studiously watch

Norton because he believed Norton had retrieved a gun. Walker added that he suspected

that Norton believed Walker to deal drugs.

Carmen Flemming inquired of Howard Norton if Norton deemed Ahnonymas

Walker a drug dealer. Norton responded that Flemming was "an ignorant son-of-bitch

and stupid." RP (Jan. 14, 2020) at 148. Norton asked Flemming if Walker told

Flemming to ask him the question. Walker interrupted and told Norton that he had not

directed Fleming to ask the question. Norton called Flemming the N word. Norton

denies uttering the racial disgrace, but another bar patron, Amanda Kincaid, heard the

slur. The bartender did not hear the racial insult.

Howard Norton told Ahnonymas Walker and Carmen Flemming that he intended

to kill the pair. Norton denies issuing the threat, but the Thirsty Dog's bartender,

Candace Guzman, overheard Norton utter the menace. RP 266. Guzman heard Norton utter: "I will kill you mother fuckers." RP (Jan. 14, 2020) at 266. Flemming took the threat seriously.

Ahnonymas Walker stood and moved to the side. Carmen Flemming told Howard Norton that the latter should not issue death threats. Flemming walked toward Norton, and Norton stood from his bar stool. Flemming backed away, and Norton walked toward him. Norton reached into his pocket. Flemming grabbed Norton's wrist, felt a gun, and a struggle ensued. Walker watched. Walker saw a gun in Norton's right hand, and he ran to the exit door in fear of being shot. He glanced back, and he saw Flemming also darting toward the door.

Carmen Fleming and Ahnonymas Walker fled the Thirsty Dog Bar. RP 150. Howard Norton also exited the tavern and fired a shot into the air. RP 202-03, 373-74. Norton screamed, "'get the hell out of here and don't fucking come back.'" RP (Jan. 14, 2020) at 203.

During his trial testimony, Howard Norton portrayed the conduct of Carmen Flemming leading to the shooting as threatening and as justifying self-defense. When he went to his car to retrieve his wallet, he adjudged the need for a weapon to protect himself. On Norton's returning to the bar, Flemming leaned toward him and stated that he planned to "F me up and anybody else that, you know, that he wants to, he can do it to anybody he said." RP (Jan. 15, 2020) at 413. Norton told him not to try. According to

Norton, Flemming stood from his chair and walked around Ahnonymas Walker toward Norton. Norton believed that "there was two big guys coming after me." RP (Jan. 15, 2020) at 417.

According to Howard Norton's trial testimony, a fearful Norton told Flemming loudly "to get the hell out of here." RP (Jan 15, 2020) at 418. When Flemming turned toward him, Norton reached into his pocket for his gun. Flemming attempted to grab Norton's arm from his pocket. Norton removed the gun from his pocket with his left hand and transferred the weapon to his right hand so that Flemming could not intercept it. He then followed Flemming and Walker out of the bar. On exiting the bar, Norton did not see Walker or Flemming. Norton waited approximately ten seconds before firing his gun and, when he discharged the gun, he did so toward the ground or air, though he could not recall which. Norton insisted that he never pointed the gun at anyone. He acted to protect himself, and the incident was not racially-motivated.

Bartender Candace Guzman phoned 911 dispatch. She reported that an elderly man pulled a gun on two black men and added that the gunman acted "extremely racist" toward the two men. RP (Jan. 14, 2020) at 269. On the arrival of law enforcement, Howard Norton, Ahnonymas Walker, and Carmen Flemming returned to the bar. All three men cooperated with officers.

Spokane Police Officer Benjamin Brown-Bieber spoke with Howard Norton and Carmen Flemming. Flemming mentioned that Norton called him ignorant and a moron,

but Flemming did not comment that Norton employed the N word.  Norton admitted he fired a shot outside of the bar.  When asked why he fired a shot, Norton stated, "he [Norton] wanted to make a believer out of him [Carmen Flemming]."  RP (Jan. 14, 2020) at 251.  Norton admitted fault for the shooting and requested that law enforcement avoid blaming the bar.  Officer Arthur Plunkett spoke to a frightened Ahnonymas Walker, who breathed heavily from scattering down an alley.

Officer Carrie Christiansen patted down Howard Norton and discovered a loaded pistol magazine in his pocket.  The magazine contained nine by eighteen mm Makarov pistol rounds.  Officers discovered a matching spent shell casing at the front entrance of the bar.  Officers found a semi-automatic pistol in Howard Norton's car.

In conversing with Officer Carrier Christiansen, Howard Norton commented that Carmen Flemming threatened him and others.  Norton remarked to Officer Christiansen, "'That's the prejudice thing, you know.'"  RP (Jan. 15, 2020) at 429.  Christiansen inquired as to what Norton meant when referring to "'the prejudice thing.'"  Norton answered: "'He's a black guy you know that. '"  RP (Jan 15, 2020) at 429.  The officer asked Norton if he was prejudiced, and Norton responded: "'I ain't prejudiced.  I don't mind sleeping with them.  I just ain't going to go to school with them.'"  RP (Jan. 15, 2020) at 429-30.

PROCEDURE

The State of Washington charged Howard Norton with two counts of second degree assault and two counts of malicious harassment, each with a firearm enhancement. The two discrete counts of second degree assault and malicious mischief arose because of the two discrete victims, Carmen Flemming and Ahnonymas Walker.

At trial, Carmen Flemming testified that Howard Norton called him the N word, and he deemed Norton's actions to be racially motivated. Defense counsel asked Flemming about his failure to report the racial slur to officers on the night of the shooting:

> Q. Why wouldn't you, at that scene when this happened, if he called you that name, why wouldn't you tell a trained police officer, who's trained to do interviews, that he used a racial slur toward you?
> A. I didn't bring it up because he wasn't there for no racial slur. He was there because the man pulled out a gun, had a gun, so I was talking to him about the incident.

RP (Jan. 14, 2020) at 225-226. Flemming did not think the language relevant at the time.

During trial, bartender Candace Guzman testified that she never heard Howard Norton employ the N word. She told the emergency dispatcher that Norton acted in a racist manner based on a comment by a customer. Patron Amanda Kincaid testified she remembered Norton utter the slur because of its piercing quality.

7

Howard Norton testified at trial in support of his defense of self-defense. On cross-examination, the State asked Howard Norton if he remembered telling Officer Christiansen, "'That's the prejudice thing, you know.'" RP (Jan. 15, 2020) at 429. The State inquired about additional statements made to Officer Christiansen, asking:

> And then Officer Christiansen says, "What's the prejudice thing?" In which you replied, "He's a black guy you know that." Do you remember that?
> A. I do.
> Q. And then she asked, "Are you prejudiced?" And you said, "I ain't prejudiced, I don't mind sleeping with them, I just ain't going to go to school with them." Do you remember that?
> A. I do.
> Q. You were just joking when you said that?
> A. It was followed up by the answer, that was just in jest, you know.

RP (Jan. 15, 2020) at 429-30. Howard Norton acknowledged shooting the gun to scare Carmen Flemming and Ahnonymas Walker.

The trial court instructed the jury on self-defense. The trial court also gave an first aggressor instruction which provided in part, that if the jury "find[s] beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense or defense of another is not available as a defense." Clerk's Papers at 145.

The jury convicted Howard Norton on all counts and returned special firearm verdicts. At the sentencing hearing on January 31, 2020, the sentencing court stated that it lacked any discretion with regard to the imposition of the sentences for the firearm

enhancements. The sentencing court sentenced Norton, who had no other countable criminal history, to the low end for each of his four offenses. Norton received 15 months on each count of second degree assault and 13 months on each malicious harassment count, to run concurrently, for an effective total of 15 months. The court imposed sentences for the firearm enhancements, including 36 months for each assault conviction and 18 months for each malicious harassment conviction, for a total of 108 months. The effective sentence for the convictions and firearm enhancements totaled 123 months with 18 months of community custody.

## LAW AND ANALYSIS

On appeal, Howard Norton asserts three assignments of error. He challenges the sufficiency of evidence to convict him of the two counts of second degree assault. He challenges the sufficiency of evidence to convict him of two counts of malicious harassment. Finally, he claims the trial court erred when ruling that the court must run his firearm enhancement sentences consecutively.

### Second Degree Assault

Howard Norton argues that he acted in self-defense and the State failed to disprove this defense beyond a reasonable doubt. Therefore, according to Norton, the jury could not find him guilty of either count of second degree assault. We disagree.

The State has the burden of proving every essential element of a charged crime beyond a reasonable doubt. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007);

9

*In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). "Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

An assault in self-defense constitutes a lawful act. *State v. Acosta*, 101 Wn.2d 612, 616, 683 P.2d 1069 (1984). RCW 9A.16.020(3) declares:

> The use, attempt, or offer to use force upon or toward the person of another is not unlawful in the following cases:
> . . . .
> (3) Whenever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person, or a malicious trespass, or other malicious interference with real or personal property lawfully in his or her possession, in case the force is not more than is necessary.

RCW 9A.16.010(1) defines "necessary" as meaning:

> that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended.

Proof of self-defense negates the knowledge element of second degree assault. *State v. Acosta*, 101 Wn.2d at 616. Since proof of self-defense negates knowledge, due process requires that the State disprove self-defense in order to prove that the defendant acted unlawfully. *State v. Acosta*, 101 Wn.2d at 616. To raise the claim of self-defense,

10

the defendant must first offer credible evidence tending to prove self-defense.  *State v.*

*Graves*, 97 Wn. App. 55, 61, 982 P.2d 627 (1999).  The State then bears the burden of

disproving self-defense beyond a reasonable doubt.  *State v. Graves*, 97 Wn. App. at 61-

62.  Evidence must show that (1) the accused subjectively feared he was in imminent

danger of death or great bodily harm, (2) this belief was objectively reasonable, (3) the

accused exercised no greater force than reasonably necessary, and (4) the defendant was

not the aggressor.  *State v. Callahan*, 87 Wn. App. 925, 929, 943 P.2d 676 (1997).  The

jury need not find an actual threat of imminent harm as long as the defendant reasonably

perceived such a threat.  *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996),

*abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009).

Self-defense requires the jury to consider both objective and subjective

considerations.  *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993).  Evidence of

self-defense must be assessed from the standpoint of the reasonably prudent person,

knowing all the defendant knows and seeing all the defendant sees.  *State v. Janes*, 121

Wn.2d at 238.  The jury must weigh the defendant's actions in light of all the facts and

circumstances known to the defendant, even those substantially predating the killing.

*State v. Janes*, 121 Wn.2d at 238.  The inquiry is subjective to the extent the jury

adjudges the facts by standing in the place of the defendant, but objective because the

jury must decide whether a reasonably prudent person in such shoes would have acted as

the defendant did.  *State v. Janes*, 121 Wn.2d at 238.

The jury enjoys the province to weigh the evidence and determine the credibility of the witnesses and decide disputed questions of fact. *State v. Dietrich*, 75 Wn.2d 676, 677-78, 453 P.2d 654 (1969). This court does not review credibility determinations on appeal. *State v. Thomas*, 150 Wn.2d at 874.

Carmen Flemming, Ahnonymas Walker, and Howard Norton agreed that they engaged in a heated verbal exchange, including a medley of profanities. They disagree as to other details. The jury served the function of resolving the truthfulness of the varying testimony.

Carmen Flemming and Ahnonymas Walker both denied that they threatened Howard Norton. The jury could believe them. Flemming, Walker, and the bartender Candace Guzman testified that Norton declared an intent to kill Flemming and Walker. Even under Norton's version of the facts, he returned, with his gun, to a seat near Flemming and lingered to pay for his food. He did not inform the bartender of any threats to his person. A jury could conclude that Norton lacked any subjective fear for his safety.

Under Howard Norton's version of the facts, Carmen Flemming approached him first and he feared that Flemming would harm him. Norton averred that he feared that two large men were coming after him. Norton reached for his gun in self-defense. Even should the jury accept that Norton feared Flemming or Ahnonymas Walker, they could determine that he exercised greater force than reasonably necessary. Once Walker and

12

Flemming ran toward the bar entrance, Norton followed them with a gun pointed toward

them. Any threat had ended. He chased them from the bar and then fired his gun. When

the two gentlemen fled the bar, Norton lacked any need to shoot.

## Malicious Harassment

Howard Norton argues that the State provided insufficient evidence to support the

two convictions for malicious harassment because the State failed to prove that Norton

threatened Carmen Flemming and Ahnonymas Walker because of their race. He argues

that Walker never testified to the use of a racial slur directed toward him. Norton

contends that the altercation arose from men being macho, not from racism. Testimony

that Norton used a racial slur and that Norton told a law enforcement officer that African-

Americans behave in a particular way deconstructs Norton's contention.

Former RCW 9A.36.080 (2010), in effect at the time of the alleged crime,

provided in relevant part:

> (1) A person is guilty of malicious harassment if he or she
> maliciously and intentionally commits one of the following acts because of
> his or her perception of the victim's race, color, religion, ancestry, national
> origin, gender, sexual orientation, or mental, physical, or sensory handicap:
> . . . .
> (c) Threatens a specific person or group of persons and places that
> person, or members of the specific group of persons, in reasonable fear of
> harm to person or property. The fear must be a fear that a reasonable
> person would have under all the circumstances. For purposes of this
> section, a "reasonable person" is a reasonable person who is a member of
> the victim's race, color, religion, ancestry, national origin, gender, or sexual
> orientation, or who has the same mental, physical, or sensory handicap as
> the victim. Words alone do not constitute malicious harassment unless the

13

context or circumstances surrounding the words indicate the words are a threat. Threatening words do not constitute malicious harassment if it is apparent to the victim that the person does not have the ability to carry out the threat.

LAWS OF 2010, ch. 119, § 1. The law required the jury to find that Howard Norton specifically threatened Carmen Flemming and Ahnonymas Walker because of his perception of their race.

RCW 9A.36.080 penalizes acts that rise to the level of malicious and intentional threats against a person based on the victim's race or color. Words stated in a context that show they are a threat constitute malicious harassment provided the person has the apparent ability to follow through with the threat. *State v. Johnson*, 115 Wn. App. 890, 896, 64 P.3d 88 (2003). The trier of fact need not weigh the extent to which bias played a role in the commission of the crime. *State v. Johnson*, 115 Wn. App. at 896. A spontaneous decision to assault someone because of the victim's membership in the targeted group is still malicious harassment. *State v. Johnson*, 115 Wn. App. at 896.

Howard Norton threatened both Carmen Flemming and Ahnonymas Walker. Both are black men. Flemming testified that Howard Norton called him the N word. He believed that Norton's statements were racially-motivated. Customer Amanda Kincaid also testified that she heard the piercing word. Norton stated to Officer Carrie Christiansen, "'That's the prejudice thing, you know.'" RP (Jan. 15, 2020) at 429. When asked what he meant, Norton stated, "'He's a black guy you know that.'" RP

14

(Jan. 15, 2020) at 429. The officer asked if Norton was prejudiced and he responded, "'I ain't prejudiced. I don't mind sleeping with them. I just ain't going to go to school with them.'" RP (Jan. 15, 2020) at 429-30. This testimony abundantly supports partial motivation of race.

In support of his contention that race did not motivate him, Howard Norton contends that his alleged use of racist terms only became disclosed after the night of the incident. Some of the evidence confirms this contention. Some does not. Regardless, the jury could find the language was used.

Sentence

The sentencing court imposed a sentence that runs 123 months. 15 of those months arise from the four substantive convictions, which sentences the court ran concurrently. One hundred eighteen of those months derive from weapon enhancements for each of the four crimes, which sentences ran consecutive to the underlying sentences and to each other. The sentence enhancements almost subsume the underlying sentence.

Howard Norton argues that the sentencing court erred when it concluded that it lacked discretion to order that his firearm enhancements run concurrently with his sentences for his underlying crimes rather than consecutively. He argues that, pursuant to *State v. McFarland*, 189 Wn.2d 47, 55, 399 P.3d 1106 (2017), a sentencing court should have discretion to impose a sentence that includes concurrent firearm-related enhancements. Precedent compels a different conclusion.

15

"As a general rule, the length of a criminal sentence imposed by a superior court is not subject to appellate review, so long as the punishment falls within the correct standard sentencing range established by the Sentencing Reform Act of 1981, chapter 9.94A RCW." *State v. Williams*, 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). Nevertheless, "this prohibition does not bar a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision." *State v. Williams*, 149 Wn.2d at 147. A court that fails to exercise its discretion has abused its discretion. *Bowcutt v. Delta North Star Corp*., 95 Wn. App. 311, 320, 976 P.2d 643 (1999).

RCW 9.94A.533 provides:

> (1) The provisions of this section apply to the standard sentence ranges determined by RCW 9.94A.510 or 9.94A.517.
> . . . .
> (3) The following additional times *shall* be added to the standard sentence range for felony crimes committed after July 23, 1995, if the offender or an accomplice was armed with a firearm as defined in RCW 9.41.010 and the offender is being sentenced for one of the crimes listed in this subsection as eligible for any firearm enhancements based on the classification of the completed felony crime. If the offender is being sentenced for more than one offense, the firearm enhancement or enhancements must be added to the total period of confinement for all offenses, regardless of which underlying offense is subject to a firearm enhancement. If the offender or an accomplice was armed with a firearm as defined in RCW 9.41.010 and the offender is being sentenced for an anticipatory offense under chapter 9A.28 RCW to commit one of the crimes listed in this subsection as eligible for any firearm enhancements, the following additional times shall be added to the standard sentence range determined under subsection (2) of this section based on the felony crime of conviction as classified under RCW 9A.28.020:

(a) Five years for any felony defined under any law as a class A felony or with a statutory maximum sentence of at least twenty years, or both, and not covered under (f) of this subsection;

. . . .

(e) *Notwithstanding any other provision of law, all firearm enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter.*

(Emphasis added.) According to the Washington State Supreme Court, the plain language of the statute not only anticipates the imposition of multiple enhancements under a single offense but clearly insists that all firearm and deadly weapon enhancements are mandatory and must be served consecutively. *State v. DeSantiago*, 149 Wn.2d 402, 418, 68 P.3d 1065 (2003) (addressing the current statute's forerunner, RCW 9.94A.510). LAWS OF 2002, ch. 290 §§ 10, 11.

*State v. Brown*, 139 Wn.2d 20, 938 P.2d 608 (1999), *overruled on other grounds by State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), forecloses Howard Norton's claim that imposition of firearm-related enhancements may be issued concurrently as opposed to consecutively. In that case, the State argued that the trial court erred in granting Natalie Brown's request for an exceptional sentence downward when it imposed a sentence below that outlined for a deadly weapon enhancement. Brown argued that, when presented with sufficient justification, the court can deviate from the sentencing range without limitation. Our high court disagreed:

RCW 9.94A.310(4) [former relevant statute] begins by providing that deadly weapon enhancements 'shall be added to the presumptive sentence[.]' The more specific language within RCW 9.94A.310(4)(e) requires that '[n]otwithstanding any other provision of law, any and all deadly weapon enhancements under this section are mandatory, [and] shall be served in total confinement.' This language clearly dictates a reading by the average informed lay voter that deadly weapon enhancements are mandatory and must be served.

*State v. Brown*, 139 Wn.2d at 28 (first alteration added). The state Supreme Court relied on this "absolute language" contained in former RCW 9.94A.310(4)(e) and stated that, if the sentencing provision "is to have any substance, it must mean that courts may not deviate from the term of confinement required by the deadly weapon enhancement." *State v. Brown*, 139 Wn.2d 29.

Howard Norton asks this court to extend the reasoning of *State v. McFarland*, 189 Wn.2d 47 (2017), in which our high court addressed sentences for firearm-related *convictions* imposed under RCW 9.94A.589(1)(c) "Consecutive or concurrent sentences." In *State v. McFarland*, Cecily Zorada McFarland contended that the sentencing court erred in concluding that it lacked discretion to impose an exceptional mitigated sentence and impose her firearm-related sentences concurrently rather than consecutively. Our high court agreed, holding that, "in a case in which standard range consecutive sentencing for multiple firearm-related convictions 'results in a presumptive sentence that is clearly excessive in light of the purpose of [the SRA],' a sentencing court has discretion to impose an exceptional, mitigated sentence by imposing concurrent

firearm-related sentences." *State v. McFarland*, 189 Wn.2d at 55 (quoting RCW

9.94A.535(1)(g)). In the opinion, the court recognized a distinction between sentencing

for firearm-related enhancements and convictions, stating that the purpose behind the

enactment of RCW 9.94A.589(1)(c) was to reverse the Supreme Court's decision in *In re*

*Post Sentencing Review of Charles*, 135 Wn.2d 239, 955 P.2d 789 (1998), and "ensur[e]

that firearm-related *enhancements* be served consecutively." *State v. McFarland*, 189

Wn.2d at 55. In *In re Post Sentencing Review of Charles*, 135 Wn.2d at 254, our high

court had held that "multiple weapon enhancements do not necessarily run consecutively

to each other."

Howard Norton also asks this court to extend the reasoning of the state Supreme

Court's opinion in *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017). There,

our high court considered the sentences of two juveniles, tried in adult court, whose

sentences included firearm enhancements. The court overruled *State v. Brown* to the

extent that it applied to bar a sentencing court from exercising its discretion with regard

to juvenile sentences. *State v. Houston-Sconiers*, 188 Wn.2d at 21 n.5. Norton points to

the opinion of Justice Madsen, who concurred in result only and insisted that the court

erred in issuing its decision in *State v. Brown*, as it took away a court's discretion to

fulfill the purpose of the Sentencing Reform Act.

We decline Howard Norton's request to follow *State v. McFarland* and *State v.*

*Houston-Sconiers*. We must follow the language of the legislature and the

implementation of that language by the Supreme Court in *State v. Brown* even if we deem

the lengthy sentence resulting from multiple sentencing enhancements unfair.

## CONCLUSIONS

We affirm all four of Howard Norton's convictions and his sentence.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Lawrence-Berrey, J.