[No. 43611-2-I. Division One. August 2, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. RICCO ANTHONY GRAVES, JR., *Appellant*.

*Christopher Gibson* of *Nielsen, Broman & Associates P.L.L.C.*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Lisa Napoli O'Toole, Deputy*, for respondent.

Per Curiam — Juvenile defendant appeals his conviction for domestic fourth degree assault. He argues that the ju-

venile court erred by concluding that (1) a self-defense claim was not available to him because his father had used reasonable force to discipline him, or, in the alternative, (2) the State had disproved self-defense. We conclude that the appellant was entitled to raise the claim of self-defense, and that, furthermore, the record does not show that the State proved the absence of self-defense. Accordingly, we reverse.

## FACTS

A juvenile court adjudged Ricco Graves, Jr., (Ricco) guilty of domestic fourth degree assault against his father, Ricco Graves (Graves), following a fact-finding hearing. The following testimony was presented at the hearing:

Graves testified that in June 1998, 15-year-old Ricco had left home without permission for a few days. When Graves located Ricco and brought him home, Graves told Ricco that he was to do chores around the house "to make up for the lost time."

The next day, Graves returned home from work and saw that Ricco had not made his bed. He questioned Ricco about it, which precipitated a small argument over whether or not Ricco had been using the phone. Graves then told Ricco that he was to do some ironing after he made his bed. When Ricco informed Graves that he was not going to complete these tasks, Graves instructed him to do yard work. Ricco refused.

Graves then testified that:

I just felt that he crossed the line with me, and I kind of let him know that, oh, yeah, you are a punk, and I started kind of like walking down the hallway towards his bedroom, and he kind of stuck his chest up and kind of stood there with his balled—you know, had his little—I can't say he really had a fist that cocked back to punch or anything, but he was just kind of like standing there ready to like get it on, more or less. And so I walked back towards his room, letting him know— and I just kept saying you're a punk, you're a punk. And he kept saying, no, I'm not a punk. No, I'm not a punk.

And as we got closer, it was that time when I went to grab him by his chin to make him look me in the face to tell him, yeah, you're a punk. And at that time I ended up on my back on the bed, and it kind—of some wr[e]stling went on, and I was trying to get up, and I actually couldn't get up, and I realized that he was actually trying to hold me there, and so I did some little reverse move on him somehow and got on top of him and subdued him and let him know that I'm his dad and I'm the boss, and this is what's going to happen.

After this first round, Graves got up and ordered Ricco to set up the ironing board and begin ironing. Ricco again refused. At this point, Graves (who apparently had started to walk away), "turned around to put a hold on [Ricco]" and to subdue him while his wife called the police. Graves stated that this second bout "was me subduing him, was me putting control on him to have the authorities come to take him out of there, because it was obvious that he was going to (unintelligible) to me." Ricco yelled obscenities at Graves while Graves lay on top of his chest. Graves released Ricco without further incident while they waited for the police.

Ricco testified as well. He acknowledged that he and Graves had gotten into an argument over his chores. He explained that ironing his father's clothes was not one of his chores, and that furthermore, he had performed yard work for two hours the previous day. Ricco stated that when he refused to do the ironing, Graves came into his room, angry.

Ricco's testimony was transcribed as follows:

Q. And what was your dad's reaction to your telling him, no, you weren't going to iron his clothes?

A. He was like, oh, yes, you are. I said, no, I'm not. And I went in my room, and he come in my room and—

Q. . . . . And what was his demeanor?

. . . .

A. He was angry. He wasn't like (unintelligible).

Q. Okay.

A. (Unintelligible).

Q. And what happened?

A. He came on me, and I thought he was going to do something, thought he was gonna do something, so I—

Q. When you say you thought he was going to do something—

A. (Unintelligible).

Q. What made you think that?

A. I don't know, just—

. . . .

Q. And what was his tone of voice like?

A. It was louder than usual.

Q. Anything else you noticed about your father at that point?

A. I was just—he was just—he was like, yes, you are a punk, like that, you are.

. . . .

Q. Did his demeanor change?

A. Yeah, when he walked into my room.

Q. And were you then scared as a result of—or concerned?

A. I wasn't scared. I just wanted him to (unintelligible). I wanted to know why he walked into my room (unintelligible).

Q. And what did he do?

A. He then (unintelligible), and I wrestled him to the bed.

Q. And what was your purpose in wrestling him to the bed?

A. Get him off me.

Q. And what did you do after you—what happened after you wrestled him to the bed?

A. When I got him to the bed, I was like five seconds (unintelligible).

THE COURT: I'm sorry, I missed that.

THE WITNESS: He was like—he wrestled me. He transformed himself.

Q. And what happened after that?

A. After that he just got up and was like (unintelligible).

Q. And what happened when he came back at you?

A. He grabbed me, and I had him by his waist, and he had me in a headlock, and he just (unintelligible), and I was like get off me. I said I'm not playing anymore. Get off me. I was mad. So at that time I was really angry.

. . . .

Q. So with this second incident he grabbed you first?

A. Yeah, he grabbed me. . . . [H]e grabbed me at the top of my shoulders, and then I slid down to his waist, and that's when he (unintelligible).

Q. And why were you grabbing your father around the waist?

A. Because he had me at the top, and I didn't see no—I wanted to get out of there. I didn't want him to be on top of me. I said: I just don't want you to put your hands on me.

Q. So you were defending yourself; is that correct?

A. (No audible response.)

Q. Can you describe a little more what your father did in . . . the first instance where you said he grabbed your chin.

A. He came in my room . . . he was like walking at me with his hands (unintelligible). He was like: Yes, you are. (unintelligible)

Q. Was he holding it tight?

A. He had it in his hands.

Q. Both hands?

A. (Unintelligible).

Q. And did that hurt?

A. No. I just couldn't see. He pushed my face like this, so I couldn't see him, so I was trying to get his hands off of me.

Following the fact-finding hearing, the juvenile court found beyond a reasonable doubt that Ricco committed an unlawful and intentional touching against Graves. In so finding, the court concluded that although Graves admitted initiating the incident, "[Ricco] had no right to self-defense in that a parent has a right to use reasonable force to discipline a child. The force used by Mr. Graves, Sr. during the physical contact with his son was reasonable and lawful." The court further concluded that in the alternative, the State had disproved self-defense beyond a reasonable doubt.

Ricco received a manifest injustice disposition of 26 weeks' commitment. This appeal follows.

## DISCUSSION

### Self-Defense

Ricco contends that the trial court erred by concluding that he was either not entitled to raise a self-defense claim, or that the State had proved the absence of self-defense. We agree.

 Ricco was charged with fourth degree assault.[1] Because "assault" is not defined in the criminal code, Washington courts apply the common law definitions, one of which is an "unlawful touching with criminal intent." *State v. Walden*, 67 Wn. App. 891, 893-94, 841 P.2d 81 (1992). But "[t]he use, attempt, or offer to use force upon or toward the person of another is not unlawful . . . [w]henever used by a party about to be injured . . . in preventing or attempting to prevent an offense against his or her person . . . in case the force is not more than is necessary." RCW 9A.16.020(3).

To raise the claim of self-defense, the defendant must first offer credible evidence tending to prove self-defense. *State v. Dyson*, 90 Wn. App. 433, 438, 952 P.2d 1097 (1997). The burden then shifts to the State to prove the absence of

---

[1]Under RCW 9A.36.041(1), "[a] person is guilty of assault in the fourth degree if, under circumstances not amounting to assault in the first, second, or third degree, or custodial assault, he or she assaults another."

self-defense beyond a reasonable doubt. *State v. Miller*, 89 Wn. App. 364, 367-68, 949 P.2d 821 (1997).

"To establish self-defense, a defendant must produce evidence showing that he or she had a good faith belief in the necessity of force and that that belief was objectively reasonable." *Dyson*, 90 Wn. App. at 438-39. Evidence of self-defense is viewed "from the standpoint of a reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees." *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993). This approach incorporates both subjective and objective characteristics. *Id.*

The State first argues that Ricco failed to produce sufficient evidence to justify raising the claim of self-defense. We disagree. Ricco testified that his father came into his room angrily, and that: "He came on me, and I thought he was going to do something." Ricco further explained that he wrestled his father onto the bed in order to "[g]et him off me," and that after the first round of wrestling, his father grabbed him and placed him in a headlock. In fact, Graves admitted in his testimony that he initiated both incidents of physical contact. We conclude that Ricco offered sufficient evidence to raise the claim of self-defense.

The State next argues that Ricco was simply precluded from raising self-defense as a matter of law because the trial court found that the father was using reasonable force to discipline him. See RCW 9A.16.100.[2] In other words, the State reasons that if the trial court found the father's force to be reasonable, then Ricco could not have been entitled to use any force against the father.

But the question of whether the father's own use of force was reasonable is a completely separate inquiry from

---

[2]RCW 9A.16.100 provides:

It is the policy of this state to protect children from assault and abuse and to encourage parents, teachers, and their authorized agents to use methods of correction and restraint of children that are not dangerous to the children. However, the physical discipline of a child is not unlawful when it is reasonable and moderate and is inflicted by a parent, teacher, or guardian for purposes of restraining or correcting the child. . . .

whether the child was initially entitled to raise the claim of self-defense. As Ricco indicates, the focus should be on the juvenile defendant to determine whether the defendant has "produc[ed] 'some evidence demonstrating self-defense . . . .' " *Miller*, 89 Wn. App. at 368 (quoting *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997)). There is no reason to depart from this standard simply because the defendant is a juvenile charged with assaulting a parent. Moreover, the State has provided no authority for the position that a juvenile defendant is altogether precluded from raising self-defense where the parent admits use of force but claims parental discipline.

Finally, we conclude that the record before us fails to show that the State proved the absence of self-defense. With regard to the first incident, Graves testified that he felt Ricco had "crossed the line" with him, so he walked into Ricco's room calling him a "punk," and then grabbed Ricco's chin. With regard to the second incident, Graves stated that he "put a hold on [Ricco]" to subdue him. On cross-examination, Graves admitted initiating both incidents. And although Ricco stated that he was not scared when Graves first walked into the room and that he was not in pain when Graves pinned him down, Ricco also testified that he thought Graves "was going to do something," and that he was trying to get Graves off of him throughout the wrestling bouts. Based on this record, we cannot say that the State has proved the absence of self-defense.

We reverse.