**FILED**
**OCTOBER 19, 2021**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37154-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER TRACY FELCH, | ) | |
| aka CHRISTOPHER TRACEY FELCH, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Christopher Felch appeals after he was convicted of

attempted murder in the second degree, first degree assault, second degree assault, and

first degree unlawful possession of a firearm. We accept the State's concession that the

trial court erred when it imposed a mandatory minimum term of 60 months' confinement

on count 3, first degree assault. We remand for the trial court to enter an order modifying

the judgment and sentence by striking that phrase. We otherwise affirm.

FACTS

*The shooting*

On May 17, 2018, Daisymae Fowler, Joshua Reimers, and Everardo Sanchez were drinking beer on Reimers's second-story porch. Fowler noticed Christopher Felch walking back and forth on the street near the apartment complex. Felch was Fowler's recent ex-boyfriend and their relationship had been abusive.

Reimers and Sanchez came down from the porch and told Felch he was not welcome there. They were concerned for Fowler's safety. They were near Felch for about 20 seconds before Sanchez saw that Felch had a pistol, told Reimers, and the two ran back upstairs. Felch remained silent and kept standing in the street.

Once upstairs, Sanchez told Felch, "Get the hell out of here." Report of Proceedings (RP) (Sept. 10, 2019) at 108. Felch mumbled something back at him and stood there for 30 to 45 seconds in silence. Felch then pulled out the pistol and started shooting at the upstairs apartment. As Sanchez and Reimers ran inside, one bullet hit Sanchez in the left toe and several bullets came within feet of Reimers.

Both Fowler and Reimers called 911. When the police arrived, Felch was no longer there. The police recovered five shell casings from the scene. The shooting was captured by a video surveillance system, which the police reviewed that evening.

2

On May 21, 2018, the Spokane police department located and arrested Felch. The State charged Felch by amended information with first degree attempted murder and first degree assault as to Reimers (counts 1 and 2), first degree assault as to Sanchez (count 3), first degree assault as to Fowler (count 4), and first degree unlawful possession of a firearm (count 5).

Before trial, Felch moved to sever count 5 from the remaining charges. The State opposed the motion. The court denied severance, finding any prejudice did not outweigh the concern for judicial economy.

On the morning of trial, Felch pleaded guilty to the unlawful possession of a firearm charge. He proceeded to trial on the remaining counts.

*Trial*

*The State's case*

The State played video surveillance from the apartment complex for the jury. The footage shows Felch pacing back and forth on the street, Sanchez and Reimers coming down the stairs, their subsequent retreat, their reemergence from the apartment, and shots fired at the second-story porch. The State called several witnesses including Sanchez, Reimers, Fowler, and the responding police officers.

*Sanchez's testimony*

Sanchez testified that he, Reimers, and Fowler were drinking beer when Fowler pointed out Felch pacing the street. Sanchez came down from the porch to tell Felch to leave because he was not welcome there. When Sanchez was about five feet away from Felch and saw the gun, he was scared. Felch did not point the gun at Sanchez initially, but he later heard Felch say, "'you messed up'" before opening fire. RP (Sept. 10, 2019) at 132. Sanchez ran into the apartment when Felch started shooting. He received medical treatment that evening for the bullet wound to his big toe. It was not a life-threatening injury.

On cross-examination, Sanchez acknowledged that his 12-year-old son came out and stood on a nearby second-story porch with a baseball bat before the shots were fired.

*Reimers's testimony*

Reimers testified that he initially approached Felch to tell him to leave. He maintains that he did not threaten Felch during the approximately 20 seconds he was near Felch. Reimers did not see Felch's gun, but heard Sanchez say, "'he's got a gun'" or something about a strap.[1] RP (Sept. 11, 2019) at 162. He and Sanchez ran back onto the upstairs porch and went inside the apartment, but neither of them retrieved a weapon.

---

[1] "Strap" is slang for gun.

When they came back outside, they started yelling at Felch to leave. Felch still said nothing and then opened fire.

*Fowler's testimony*

Earlier on the day of the shooting, Fowler saw Felch at a grocery store. Felch told Fowler "to tell your [racial slur] boyfriend that next time he walks past my house I'm going to shoot him." RP (Sept. 11, 2019) at 241. That evening, she told Reimers about this interaction that she took seriously but then "shrugged it off." RP (Sept. 11, 2019) at 241.

When Fowler saw Felch pacing below the apartment that evening, she was concerned. She heard Reimers and Sanchez tell Felch to stop scaring her; they did not threaten Felch. One of them said, "'he's packing'" as they ran upstairs from the street. RP (Sept. 11, 2019) at 254. Fowler stood in the doorway to the porch. When Reimers and Sanchez went back outside to see if Felch had left, Fowler heard the shots. She ran inside the apartment when the shots were fired.

*The defense's case*

*Felch's testimony*

On the night of the shooting, Felch was pacing the street and waiting for a friend. Felch heard people yell from the porch that he "needed to leave or else they were going to

make [him] leave." RP (Sept. 12, 2019) at 48. He saw Reimer and Sanchez, who were bigger than him, and he was scared they were going to beat him up. Felch pulled his gun so "they would leave [him] alone," but he "didn't want to hurt nobody." RP (Sept. 12, 2019) at 50. He heard them say something about a strap when they ran upstairs. He testified, "I was thinking they armed themselves because they were yelling about a strap, and I couldn't see anybody coming back out when someone had a gun. That's crazy behavior." RP (Sept. 12, 2019) at 52. When Reimer and Sanchez came back out of the apartment, they continued yelling. Felch was "[w]orried about dying or being beat up." RP (Sept. 12, 2019) at 52. He explained, "[T]hey came back out and I had a gun. I figure they must have had one, too. Why would someone do that if they didn't have a weapon? That's nuts. It scared me to death." RP (Sept. 12, 2019) at 53.

Felch saw someone on a nearby porch come out with a baseball bat. He thought someone would hit him with the bat, which would do a lot of damage to the metal plate in his arm. He testified, "I pulled the trigger on my gun. I didn't know if they were coming at me or what. They hollered at me that they would—" RP (Sept. 12, 2019) at 56. His intent upon firing was "[t]o get out of there alive." RP (Sept. 12, 2019) at 57. He "wasn't really aiming" and was "just pointing [in] that direction." RP (Sept. 12, 2019) at 68. He

intended to shoot once, but after the first shot the "gun started going" and "jumped in [his] hand." RP (Sept. 12, 2019) at 65, 73.

On cross-examination, Felch explained he was disappointed that Fowler was staying with Reimer. Although he had broken up with Fowler one month prior to the shooting, he had been in love with her and had previously asked her to marry him. He wanted to see if Fowler's stuff would be safe if he brought it to Reimer's house. He also wanted to talk to Reimer to tell him that Fowler was still hanging around his house sometimes.

Felch did not leave immediately after the shooting because he was in shock. He testified that he was terrified, but acknowledged that he stayed there after Reimers and Sanchez went inside—rather than going home or calling for help.

*Jury instructions, verdict, and sentencing*

The jury was instructed on first and second degree murder, first and second degree assault, and the following defense:

> It is a defense to a charge of attempted murder, (any degree), and assault, (any degree) that the attempted murder, or assault was justifiable as defined in this instruction.
> Any attempted murder, and any assault is justifiable when committed in the lawful defense of the defendant when:
> (1) the defendant reasonably believed that the person attempted to be slain or assaulted or others whom the defendant reasonably believed were acting in concert, intended to inflict death or great personal injury;

7

(2) the defendant reasonably believed that there was imminent danger of such harm being accomplished; and

(3) the defendant employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the defendant, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the attempted murder, and assault was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return verdicts of not guilty.

Clerk's Papers (CP) at 256. The next instruction provided that the law imposes no duty to retreat.

The jury found Felch (1) not guilty of attempted murder in the first degree of Reimers as charged in count 1 but guilty of the lesser included crime of attempted murder in the second degree, (2) guilty of first degree assault of Reimers as charged in count 2, (3) guilty of first degree assault of Sanchez as charged in count 3, and (4) not guilty of first degree assault of Fowler as charged in count 4, but guilty of the lesser included offense of second degree assault. By special verdicts, the jury found that Felch and Fowler were members of the same family or household and that Felch was armed with a firearm for each count.

The trial court found that counts 1 and 2 merged. At sentencing, Felch requested an exceptional sentence downward. He first argued that Reimers and Sanchez were the

"initiators or aggressors or provokers" and his failed self-defense could be a basis for a downward sentence.  RP (Oct. 17, 2019) at 265.  Second, he argued the multiple offense policy results in a clearly excessive sentence—the State asked for 485 months when the midpoint range for attempted second degree murder is 194 months.

Felch also requested the court revisit the mandatory minimum on count 3.  He argued that under *State v. Dyson*, 189 Wn. App. 215, 360 P.3d 25 (2015), any mandatory minimum requirement has to be submitted to the jury for specific findings.

The State asked the court to impose the high end within the standard sentencing range.  It reminded the court that Felch both brought a gun to the victims' home that night and argued they were not the initiators.

After allowing Felch to make a statement, the following exchange took place:

> THE COURT:  . . . What the Court saw is that you and [Fowler] had a relationship, didn't work out for you, and you're pacing in front of her new boyfriend's apartment complex.  You don't live there, and you got a gun on you, and it shows you went back and forth across several times.
> . . . .
> . . . Then they come down to confront you to tell you to leave and you pull out a gun, and they run back to their apartment.  You should have left.
> [FELCH]:  I was trying to leave when they came back out and started yelling at me again.
> THE COURT:  Listen to what I'm saying.  You could have left.  Instead they came back out, and they're thinking they're out on their porch.  Even if you take your scenario that they're yelling at you from the second floor, you still could have left, but instead you pull it out and start shooting

9

at an apartment complex that could have resulted in a lot more deaths in that building, and then you got a kid who hears the shots and comes out with a baseball bat on the second floor.

[FELCH]: Ma'am, he was out with the bat before I fired.

THE COURT: And you continued to walk, and then you stopped and shot again.

. . . .

So when the Court looks at that with the weapons enhancement, you got a lot of time just on the minimums. I probably think considering this crime that you probably should get the high end, but based on your history and the amounts you've got here, I think I'm going to end up just giving you the low end on each of these.

RP (Oct. 17, 2019) at 272-73.

The court imposed a total term of 380.25 months' imprisonment with a mandatory 60-month minimum for count 3.

Felch timely appealed.

## ANALYSIS

SUFFICIENCY OF EVIDENCE

Felch contends the State brought insufficient evidence to disprove his self-defense claim. We disagree.

Self-defense claims are defined by statute. Homicide is justifiable when it is committed:

10

> In the lawful defense of the slayer . . . when there is reasonable ground to apprehend a design on the part of the person slain . . . to do some great personal injury to the slayer . . . and there is imminent danger of such design being accomplished.

RCW 9A.16.050.

To raise a self-defense claim, "the defendant must first offer credible evidence tending to prove self-defense." *State v. Graves*, 97 Wn. App. 55, 61, 982 P.2d 627 (1999). That evidence must show (1) the defendant subjectively feared imminent danger of death or great bodily harm, (2) this belief was objectively reasonable, (3) the defendant used no greater force than was reasonably necessary, and (4) the defendant was not the aggressor. *State v. Callahan*, 87 Wn. App. 925, 929, 943 P.2d 676 (1997). The first element "requires the jury to stand in the shoes of the defendant and consider all of the facts and circumstances known to him or her" while the second element "requires the jury to use this information to determine what a reasonably prudent person similarly situated would have done." *State v. Walden*, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997).

When a defendant brings evidence supporting self-defense, the burden shifts to the State to disprove the claim beyond a reasonable doubt. *State v. Miller*, 89 Wn. App. 364, 367-68, 949 P.2d 821 (1997). A defendant claiming the State failed to disprove self-defense must show that the evidence, when viewed in the light most favorable to the State, would convince no reasonable person to find the essential elements of the crime

11

beyond a reasonable doubt. *See State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012) (sufficiency of evidence standard generally).

The jury was instructed on self-defense. Felch's self-defense evidence does not meet the four-element standard articulated above. First, the evidence of his subjective fear was weak. Although he testified that he was "terrified" when Sanchez and Reimers confronted him, they retreated when he brandished a gun. He alleges they continued yelling at him from the porch, but he chose not to leave. Nor did he leave when Reimers and Sanchez went back into the apartment. This evidence tends to show Felch was *not* afraid for his life despite his testimony to the contrary. The jury determined Felch's testimony was not credible and such determinations are not subject to appellate review. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

Second, Felch's conduct was not objectively reasonable. Sanchez, Reimers, and Fowler testified consistently about the events leading up to the shooting. Felch testified inconsistently with their accounts. The jury watched the video footage. Evidently, the jury determined a reasonably prudent person in Felch's situation would not have reasonably feared imminent danger from Sanchez and Reimers. Felch's decision to stay where he was after brandishing his weapon and then shoot at an apartment complex

almost one minute after Reimers and Sanchez retreated does not support his claim that his fear of harm was objectively reasonable.

Third, Felch used more force than reasonably necessary to defend himself. Although he saw Sanchez's 12-year-old son with a bat, Sanchez's son was many yards away from Felch on a second-story porch. Neither Reimer nor Sanchez was armed, and they too were quite far from Felch on a second-story porch. His use of force (shooting) was certainly greater than necessary given these circumstances.

Fourth, Felch likely was the aggressor. Generally, "the right of self-defense cannot be successfully invoked by an aggressor or one who provokes an altercation, unless he or she in good faith first withdraws . . . ." *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). Here, Felch was armed and pacing by his ex-girlfriend's house, refused to leave when asked, and escalated the situation by brandishing his gun. Although Reimers and Sanchez approached Felch first and yelled at him to leave, they testified—consistent with Fowler—that they did not threaten him. Felch could have left but he instead initiated violence by drawing and later shooting his gun. *See id.* at 910 (when "the defendant made the first move by drawing a weapon" the aggressor instruction is warranted).

Viewing the evidence in the light most favorable to the State, we conclude that a reasonable person could find that the State disproved Felch's self-defense claim beyond a reasonable doubt.

EXCEPTIONAL SENTENCE

Felch argues the trial court erred in failing to consider his request for an exceptional sentence downward. We disagree.

"Under the Sentencing Reform Act of 1981 [(SRA), chapter 9.94A RCW], a trial court must impose a sentence within the standard range unless it finds substantial and compelling reasons to justify a departure." *State v. Smith*, 82 Wn. App. 153, 160-61, 916 P.2d 960 (1996); RCW 9.94A.535. Generally, appellate review is precluded for defendants challenging sentences that fall within the standard sentencing range. *State v. Garcia-Martinez*, 88 Wn. App. 322, 329, 944 P.2d 1104 (1997). However, a defendant may challenge such a sentence if the trial court "has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." *Id.* at 330. Such a refusal must be "categorical," i.e., the court "takes the position that it will never impose a sentence below the standard range." *Id.* When "a trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence," a defendant may not appeal that discretionary ruling. *Id.*

14

This court will not reverse a trial court's discretionary decision unless it is manifestly

unreasonable, made on untenable grounds, or with untenable reasons. *State ex rel.*

*Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Citing *State v. Korum*, 157 Wn.2d 614, 141 P.3d 13 (2006), Felch argues the trial

court abused its discretion by not meaningfully considering his request for an exceptional

sentence downward on the record. *Korum* does not stand for that proposition. The

*Korum* court noted, "*Even though it was not required to do so*, the sentencing court did

consider a downward departure . . . ." *Id.* at 637 (emphasis added). It reiterated that a

trial court "has the discretion to determine whether the circumstances warrant an

exceptional sentence downward." *Id.*

Felch argued that two mitigating factors supported an exceptional sentence

downward. First, Reimers and Sanchez were the initial aggressors, and, second, the

multiple offense policy resulted in a presumptive sentence that is clearly excessive.

*See* RCW 9.94A.535(1)(a), (g).

The trial court implicitly rejected Felch's claim that Reimers and Sanchez were the

initial aggressors. It noted that Felch was pacing outside his ex-girlfriend's house, where

he did not live, was told to leave, and could have left after displaying his weapon. Instead

of leaving, he escalated the situation by standing outside, waiting for the victims to

15

reemerge, and shooting at an apartment complex. The trial court's rejection of Felch's self-defense argument was not impermissible and its imposition of a sentence within the standard range was reasonable.

The trial court also implicitly rejected Felch's argument that the presumptive sentence was clearly excessive. After noting that Felch could have killed many people and he probably should get a high-end sentence, it instead imposed a low-end sentence, noting the amount of time he was facing.

Finally, contrary to Felch's contention, the trial court did not refuse to exercise its discretion. That is, it did not take a position that it would *never* impose a sentence below the standard range. The court explained the facts and exercised its discretion in a reasonable manner. The court had discretion to consider an exceptional sentence, but was "in no way required to depart from the presumptive sentence." *Korum*, 157 Wn.2d at 637. We will not reverse such a decision absent abuse of discretion or misapplication of the law, neither of which occurred here. *See State v. Graciano*, 176 Wn.2d 531, 536, 295 P.3d 219 (2013).

MANDATORY MINIMUM

Felch contends the trial court erred in imposing the mandatory minimum sentence for count 3 without the jury making a separate factual finding that he used force likely to

result in death or intended to kill the victim. The State concedes this issue. We accept

the State's concession but disagree that remand is necessary.

In *Dyson*, this court addressed the issue Felch raises here. There, we held that the

imposition of a mandatory minimum based on judicial findings not submitted to the jury

violates a defendant's constitutional rights. 189 Wn. App. at 227-28. We explained that,

under *Alleyne v. United States*, 570 U.S. 99, 228, 133 S. Ct. 2151, 186 L. Ed. 2d 314

(2013), "a jury must find beyond a reasonable doubt those facts that trigger a mandatory

minimum sentence." *Dyson*, 189 Wn. App. at 228. Mandatory minimums prejudice

defendants because they preclude the ability to apply for early release, thus potentially

resulting in a longer imprisonment. *See id.*

Here, the jury did not make the required factual finding provided for in

RCW 9.94A.540(1)(b).[2] The court cannot impose a mandatory minimum without the

jury's finding. However, the 60-month mandatory minimum sentence imposed on count

3 represents substantially less than Felch's 153-month standard range sentence on that

count. To order resentencing would serve no useful purpose. Instead, we remand for the

trial court to enter an order modifying paragraph 4.1(a) of Felch's judgment and sentence

---

[2] "An offender convicted of the crime of assault in the first degree . . . where the offender used force or means likely to result in death or intended to kill the victim shall be sentenced to a term of total confinement not less than five years."

by striking the language that imposes a 60-month minimum term of confinement on count 3.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In his statement of additional grounds for review (SAG), Felch raises two issues, both of which are framed as instances of judicial bias. We lay out the relevant standards before addressing each issue.

"At a minimum, due process 'requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case.'" *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004) (internal quotation marks omitted) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997)). We presume a trial court performs its duties without bias. *In re Marriage of Meredith*, 148 Wn. App. 887, 903, 201 P.3d 1056 (2009). The party alleging bias must overcome that presumption with specific facts to evince actual or apparent bias. *Davis*, 152 Wn.2d at 692; *State v. Post*, 118 Wn.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992). "Judicial rulings alone almost never constitute a valid showing of bias." *Davis*, 152 Wn.2d at 692.

*SAG #1: Judicial bias—prejudice*

Felch contends the trial judge demonstrated prejudice against him at sentencing

because when he brought up the portion of his testimony that was struck from the record

(due to hearsay issues), the judge told him the rules were different because he was the

defendant. Felch argues this statement shows the judge believed Felch was guilty before

trial. We disagree.

The hearsay rules treat a party differently than a witness. ER 801 provides in

relevant part:

> **(d)  Statements Which Are Not Hearsay.**  A statement is not
> hearsay if—
> . . . .
> (2)  *Admission by Party-Opponent.*  The statement is offered against
> a party and is (i) the party's own statement . . . .

Therefore, the trial judge properly permitted witnesses to testify about what Felch said

while not allowing Felch to testify about what witnesses said. The trial judge did not

show bias. Instead, the judge correctly applied this rule of evidence.

Felch also says the trial judge would not permit him to bring up that he is disabled.

He does not provide specific facts evincing actual or apparent bias nor does he provide

citation to the record or authority. We decline to review this claim. RAP 10.3(a)(6).

19

*SAG #2: Judicial bias—family member*

Felch next argues that the trial judge went to high school with the mother of his

nephew.[3] Felch's point is unclear. We do not see how a judge going to high school with

a distant relative of a defendant creates any improper risk of bias. Judges should

disqualify themselves when they are within three degrees of relationship to a party or

material witness. CJC 2.11(A)(2). But having gone to high school with a party's

extended relative is not prohibited by the ethics rules.

Felch also argues the trial judge conceded bias when the judge instructed the jury

several times to ignore the judge's behavior because the Washington Constitution forbade

the judge from assuming guilt. Again, he does not cite to the record. We are confident,

however, that the trial judge's instruction to the jury was a standard cautionary one

routinely given throughout trial. The instruction, given as a concluding instruction before

the jury deliberated, states:

> Our state constitution prohibits a trial judge from making a comment
> on the evidence. It would be improper for me to express, by words or
> conduct, my personal opinion about the value of testimony or other
> evidence. I have not intentionally done this. If it appeared to you that I

---

[3] His SAG reads: "Judge Plese went to high school with Michelle Dietz . . . mother of Maria Constance Schlienger mother of my nephew Paul David Felch's daughter whom Judge Plese is not suppose to have anything to do with. My nephew that is, so this might have influenced the Judge's behavior . . . ."

have indicated my personal opinion in any way, either during trial or in giving these instructions, you must disregard this entirely.

CP at 224. The giving of this or a similar standard instruction does not establish

the trial judge was biased. We reject Felch's claims of judicial bias.

Affirm, but remand for entry of order striking minimum term on count 3.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.

21