## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58097-7-II |
| Respondent, | |
| v. | |
| A.T., | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — A.T. appeals the juvenile court's order adjudicating her guilty of two counts of assault in the third degree and one count of interference with a health care facility. A.T. argues that the evidence was insufficient to support the guilty finding on the assault charges because the State failed to disprove self-defense beyond a reasonable doubt and because the State failed to prove that A.T. assaulted a health care provider as defined by statute. A.T. also argues that her adjudication for interfering with a health care facility must be reversed because the State failed to prove she made true threats under the recent constitutional standard articulated in *Counterman*.[1] Finally, A.T. argues we should remand for the juvenile court to strike the DNA collection fee.

We affirm the juvenile court's adjudication that A.T. is guilty of two counts of assault in the third degree. We reverse the juvenile court's adjudication that A.T. is guilty of interfering with a health care facility. Further, we remand to the juvenile court to strike the $100 DNA collection fee.

---

[1] *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023).

FACTS

On January 12, 2023, Deputy Isaac Ingle responded to Centralia High School because A.T. was refusing to leave the school. When A.T. made comments about self-harm and suicide, Ingle determined that A.T. needed to be involuntary detained in a medical facility for her safety. A.T. was transported to the emergency department at Centralia Providence Hospital. When A.T. was admitted, she was told she needed to change into scrubs. A.T. resisted changing her clothes and was kicking and screaming. Ultimately, hospital staff, hospital security, and Ingle restrained A.T. to the hospital bed and changed her clothes. Later, two nurses informed Ingle that they had been assaulted by A.T. The State charged A.T. with two counts of assault in the third degree and one count of interference with a health care facility.

At the factfinding hearing, Ingle testified that he responded to Centralia High School because A.T. was refusing to leave the school. Ingle met with A.T. and learned that A.T.'s father had previously responded to the school but had left to return to work. A.T. said she did not want to go with her father and she did not feel safe. Ingle contacted A.T.'s father and he returned to the school to have another conversation with A.T. A.T. started to leave with her father, but then began making comments regarding self-harm and wanting to die.

Footage from Ingle's body camera was also admitted at the factfinding hearing. The initial body camera footage showed A.T. waiting calmly on a gurney in a hallway before she was admitted to the hospital. The second part of the body camera footage begins with Ingle entering the treatment room to speak with A.T. because she was resisting the hospital staff's instructions. Ingle began explaining why A.T. was brought to the emergency room and A.T. shouted, "Yeah, I know, cause [sic] I said I was going to kill myself so I could get the f**k away from my dad." Ex. 1 (video 443_6) at 00:36-00:41. In the video, A.T. is wearing a bra, a crop top, and leggings. Ingle

2

explained that A.T. was not in any criminal trouble and encouraged A.T. to comply with the hospital staff's directions.

A.T. asked why she should comply with the hospital staff's directions. A nurse and Ingle told A.T. that if she did not comply they would have to restrain her. The nurse also told A.T. that she was disrupting the emergency room and A.T. responded, "That sucks doesn't it?" Ex. 1 (video 443_6) at 02:17-02:18. The nurse asked if A.T. was going to cooperate with changing her clothes. A.T. responded that the hospital staff was not going to cut her clothes off. Security personnel entered the room and A.T. refused to change while security was in the room. The nurse said security would turn around but they would stay in the room because A.T. had made threats that the hospital staff had to take seriously. When A.T. continued to resist the hospital staff's instructions, the nurse told A.T. they were done discussing things. Ingle was outside the room at this time, but his body camera recorded A.T. screaming.

A.T. screamed, "f***ing bitch" and that she would "f***ing kill all of you." Ex. 1 (video 443_6) at 03:52-03:56. A.T. continued screaming. Hospital staff requested that Ingle reenter the room. Staff in the room stated they had been kicked and were going to file charges. A.T. continued screaming continuously as her clothes were cut off. Another hospital staff member in the room ordered medication and told A.T. they were trying to help her and the medication would calm her down. A.T. continued screaming as hospital staff restrained her to the hospital bed. While hospital staff attempted to put the scrubs on her, A.T. screamed, "This bitch is going to pull my knee out," and then screamed, "This bitch, I'm gonna [sic] f**k you up." Ex. 1 (video 443_6) at 06:23-06:28. Hospital staff repeatedly encouraged A.T. to calm down. A.T. continued to scream for several minutes while hospital staff got her dressed in medical scrubs.

Tiffany Zwiefelhofer testified that she was a registered nurse in the hospital emergency department. On the day A.T. was admitted to the emergency department, Zwiefelhofer was working as a float nurse and was assigned to check in A.T. when she arrived. Zwiefelhofer explained that when a patient has been detained by law enforcement, hospital policy requires the patient to change out of their normal clothing into hospital scrubs so they can be identified if they are seen out of their room. Zwiefelhofer also noted there were safety reasons such as ensuring the patient did not have anything that could be used to harm themselves or others.

When Zwiefelhofer entered A.T.'s room, A.T. appeared agitated and tense. Zwiefelhofer testified that A.T. did not want to change into scrubs. Zwiefelhofer tried to calm A.T., but A.T. continued to be resistant to changing into the scrubs. At one point, A.T. threatened to kill Zwiefelhofer. Zwiefelhofer told A.T. that it was illegal to threaten to kill her. Ultimately, Zwiefelhofer told A.T. that changing into scrubs was a requirement, and if A.T. continued to refuse to change, she would be restrained.

The charge nurse came into the room and asked Ingle to come back in the room to speak to A.T. Security was also called into the room. When A.T. continued to refuse to change her clothes, she was restrained. Security restrained A.T.'s upper body by bending her forward on the hospital bed. Zwiefelhofer testified that A.T. was flailing her legs and A.T. kicked Zwiefelhofer in the hand while Zwiefelhofer was removing A.T.'s clothes.

Zwiefelhofer testified that A.T.'s conduct interfered with her and others' ability to do their jobs. Zwiefelhofer also explained that A.T. required immense resources, which prevented those staff from treating other patients.

Autumn Deal testified that she was a certified nursing assistant working as an emergency department technician at the hospital. Deal testified that she heard A.T. yelling in her room and

went to help with the process of getting A.T. changed into scrubs. Deal testified that psychiatric patients were required to wear scrubs for safety because normal hospital gowns had ties that could be used as ligatures.

When Deal entered the room, A.T. was yelling and the nurse was trying to explain to A.T. what needed to happen. A.T. was adamantly refusing to comply. Another nurse came in the room and told A.T. that if she did not change into the scrubs so they could continue care, A.T. would have to be restrained and her clothes cut off. Deal testified that while security was restraining A.T.'s upper body to the bed, Deal was attempting to get A.T.'s pants off without having to cut them. A.T. was resisting and kicking Deal repeatedly. Deal testified that A.T. appeared to know Deal was behind her because she turned and looked at her while she was resisting getting her clothes changed.

Deal testified A.T. was screaming while she was resisting and causing a commotion in the emergency room. Deal also explained that A.T. was interfering with the ability of the emergency room to operate effectively and more than a normal amount of resources were being used to address A.T.'s behavior.

A.T. also testified at the factfinding hearing. A.T. testified that she was in the hospital room refusing to change into scrubs because she did not want to change. When A.T. continued to refuse to change, the nurses called security. A.T. then began to change, but refused again when security arrived because she did not want male security staff in the room when she changed. Despite being told that the security officers would turn around while she changed, A.T. refused to change while they were in the room.

Then the security guards grabbed A.T.'s arms and restrained her face down on the bed. A.T. began struggling to get away from them: "I was kicking my feet, on the floor, trying to get

my whole body to move so I could get out of them holding me down." Rep. of Proc. at 56. A.T. testified that she did not know that there was anyone behind her. She was not trying to kick anyone and was not aware that she had kicked anyone.

In closing argument, A.T. argued that the Involuntary Treatment Act (ITA), chapter 71.05 RCW, provided patients with the right to wear their own clothes unless an individualized determination was made that depriving the patient of their clothes was necessary for safety. A.T. also argued that there was no assault because A.T. did not know anyone was behind her and was only kicking to try to get on the floor to push away. And, A.T. argued that she was only acting in self-defense because the hospital staff was not entitled to use force to change her clothes.

The trial court found that A.T. threatened suicide to avoid going home with her father and, as a result, was detained and transported to the hospital. The trial court also found that the hospital had a policy requiring behavioral health patients to change into certain scrubs so they can be identified and to remove any clothing that could be used as a ligature. And the trial court found that A.T. "was wearing a brassiere, and a sports bra, as well as leggings, any of which could be used as a ligature." Clerk's Papers (CP) at 37.

A.T. repeatedly refused to comply with medical staff's instructions to change her clothes and threatened physical harm against the staff. Based on A.T.'s threats, security was called into the room. Ingle was also called into the room to advise A.T. of the consequences of refusing to comply with medical staff's instructions to change her clothes, including possible criminal charges. When A.T. continued to refuse to change her clothes, she was warned that she would be restrained and her clothes cut off.

6

As to the assaults, the trial court made the following findings of fact:

19. Tiffany Zwiefelhofer, a Registered Nurse employed in the hospital and working in her capacity as a nurse, was behind [A.T.] attempting to remove her clothes.
20. Autumn Deal, a Certified Nursing Assistant employed in the hospital and working in her capacity as a nurse, was also behind [A.T.] attempting to remove her clothes.
21. [A.T.] knew both Nurse Zwiefelhofer and CNA Deal were behind her as she was being restrained by security personnel, because they were speaking to her and giving her verbal directives during the struggle.
22. [A.T.] screamed loudly during this struggle.
23. As [A.T.] was struggling with security, she kicked both Nurse Zwiefelhofer and CNA Deal.
24. [A.T.]'s actions were intentional assaults on both Nurse Zwiefelhofer and CNA Deal.

CP at 37. The trial court also found that A.T.'s testimony that she did not know anyone was behind her and she was only attempting to push off the floor was not credible. Additionally, the trial court found that A.T.'s conduct was disruptive to operations at the hospital. And, A.T.'s conduct was unreasonable and disturbed the peace at the hospital.

The trial court concluded that the provision of the ITA cited by A.T. did not apply to this case. And, the trial court concluded that A.T. was guilty of two counts of assault in the third degree and one count of interference with a health care facility as charged. The trial court imposed a standard range sentence of 2 days' confinement, 32 hours of community restitution, and 12 months' supervision. The trial court also imposed a $100 DNA collection fee.

A.T. appeals.

ANALYSIS

I.    THIRD DEGREE ASSAULT

A.T. argues that there was insufficient evidence to support her adjudication for assault in the third degree because the State failed to disprove self-defense beyond a reasonable doubt. A.T. also argues that there was insufficient evidence to prove the second assault in the third degree

7

count because there was no evidence that Deal was a health care provider as defined by statute. We disagree.

"In a juvenile proceeding, as in an adult case, the evidence is sufficient to support an adjudication of guilt if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find all the essential elements of the crime charged beyond a reasonable doubt." *State v. E.J.Y.*, 113 Wn. App. 940, 952, 55 P.3d 673 (2002). "A claim of insufficient evidence 'admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *Id.*

A.     Self-Defense

A person is guilty of assault in the third degree if they, under circumstances not amounting to assault in the first or second degree, assaults a nurse, physician, or health care provider who was performing their health care duties at the time of the assault. RCW 9A.36.031(1)(i).[2] "'Assault is an intentional touching or striking of another person that is harmful or offensive, regardless of whether it results in physical injury.'" *State v. Jarvis*, 160 Wn. App. 111, 119, 246 P.3d 1280 (2011) (quoting *State v. Tyler*, 138 Wn. App. 120, 130, 155 P.3d 1002 (2007)).

Self-defense is a defense to assault. *See* RCW 9A.16.020. "The use, attempt, or offer to use force upon or toward the person of another is not unlawful . . . [w]henever used by a party about to be injured, or . . . in preventing or attempting to prevent an offense against his or her person." RCW 9A.16.020(3). Self-defense is available only to respond to the unlawful use of

---

[2] RCW 9A.36.031 was amended, effective June 2024. LAWS OF 2024, ch. 220, § 1. This amendment did not affect the section of the statute under which A.T. was charged. Therefore, we cite to the current version of the statute.

force. *State v. Riley*, 137 Wn.2d 904, 911, 976 P.2d 624 (1999). "If the defendant meets the 'initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense,' then the State has the burden to prove the absence of self-defense beyond a reasonable doubt." *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting *Riley*, 137 Wn.2d at 909, 910 n.2).

As an initial matter, A.T. claims that, even if the hospital staff had legal authority to use force to change her clothes, she was entitled to use lawful force in self-defense. This is incorrect. It is well-established that self-defense must be used to defend against *unlawful force*. *Riley*, 137 Wn.2d at 911.

A.T. claims that *State v. Graves*, 97 Wn. App. 55, 982 P.2d 627 (1999), establishes that a defendant is entitled to use force in self-defense against the lawful use of force. However, A.T. misreads *Graves*. *Graves* held that a child was not legally precluded from raising self-defense simply because the State alleged the force the child used was used against a parent exercising reasonable parental discipline. 97 Wn. App. at 62-63. A fair reading of *Graves*, in light of well-established law that self-defense cannot be used in response to the lawful use of force, is that a defendant is not precluded from arguing self-defense if their actions are in response to some exercise of force, but if the force used against the defendant was lawful the State has met its burden to disprove self-defense. *See Graves*, 97 Wn. App. at 62-63 ("But the question of whether the father's own use of force was reasonable is a completely separate inquiry from whether the child was initially entitled to raise the claim of self-defense.").

Moreover, A.T. was not precluded from raising self-defense. A.T. clearly argued that she was acting in self-defense. Instead of concluding that A.T. was not entitled to raise self-defense, the juvenile court essentially found that the hospital staff's use of force was lawful and, implicitly

found that the State disproved A.T.'s claim of self-defense. Accordingly, the issue in this case is properly whether the State disproved A.T.'s claim of self-defense by proving that the hospital staff exercised lawful force.

Here, the juvenile court found that the hospital had a policy requiring mental health patients to change into scrubs to make them identifiable and to remove the risk of clothing that may be used as a ligature. The trial court also found that A.T. was wearing clothing that could be used as a ligature[3] and was repeatedly warned that her clothes would be forcibly removed if she continued to refuse to change her clothes. Finally, the trial court found that A.T. was held down by security officers "as her clothing was cut from her, and the scrubs were put on her by medical staff." CP at 37. These findings support the juvenile court's conclusions that a hospital has a duty to protect patients and the "steps taken by the hospital were reasonable and necessary to protect a patient ([A.T.]) that had threatened suicide and had threatened to physically harm and verbalized that she was going to kill medical and security personnel." CP at 38.

Based on the juvenile court's findings and conclusions, it is apparent that the juvenile court concluded that the State proved that the hospital staff were taking reasonable and necessary action to ensure compliance with a hospital policy which was meant, at least in part, to ensure A.T.'s safety. In other words, the juvenile court concluded that the hospital staff was using lawful force and, therefore, the State disproved A.T.'s claim that she was acting in self-defense.

---

[3] A.T. assigns error to this finding of fact but claims the finding is irrelevant and does not explain how this finding of fact is not supported by substantial evidence. Generally, we will not consider assignments of error that are not supported by argument and citation to authority. RAP 10.3(a)(6). Further, the video clearly shows the clothes that A.T. was wearing and it is a reasonable inference that the straps and clothing could be used as a ligature.

However, A.T. argues that hospital staff did not have the legal authority to force her to change clothes because RCW 71.34.355 protects a minor's right to wear their own clothing when receiving mental health treatment.[4]  We disagree.

RCW 71.34.351 provides,

> A peace officer may take or authorize a minor to be taken into custody and immediately delivered to an appropriate crisis stabilization unit, 23-hour crisis relief center, *evaluation and treatment facility*, secure withdrawal management and stabilization facility, approved substance use disorder treatment program, *or the emergency department of a local hospital* when he or she has reasonable cause to believe that such minor is suffering from a behavioral health disorder and presents an imminent likelihood of serious harm or is gravely disabled.

(Emphasis added.)[5]  "Evaluation and treatment facility" is defined as "a public or private facility or unit that is licensed or certified by the department of health to provide emergency, inpatient, residential, or outpatient mental health evaluation and treatment services for minors."  Former RCW 71.34.020(24) (2021).[6]  RCW 71.34.355(1) provides, in relevant part, that "[a]bsent a risk to self or others, minors *treated* under this chapter have the following rights, which shall be prominently posted in the *evaluation and treatment facility*: (a) To wear their own clothes and keep and use personal possessions."

---

[4] We note that, at the juvenile adjudication, A.T. relied on provisions of chapter 71.05 RCW, which is the statutory scheme governing involuntary treatment of behavioral health disorders for adults, rather than chapter 71.34 RCW, which is the statutory scheme governing involuntary treatment of behavioral health disorders for minors.  However, because the statutes and the accompanying arguments are substantially the same, we do not consider this argument barred by RAP 2.5(a).

[5] In 2024, the legislature amended RCW 71.34.351 to include "23-hour crisis relief center."  LAWS OF 2024, ch. 367, § 5.  This amendment does not change our analysis and, therefore, we cite to the current version of the statute.

[6] And all other facilities referenced in RCW 71.34.351 are defined by statute, except "emergency department of a local hospital."  Former RCW 71.34.020(5), (15), (59); *see also* RCW 71.34.020(1) (23-hour crisis relief centers add in 2024).

The specific rights in RCW 71.34.355(1) clearly apply to minors being treated in an evaluation and treatment facility. Reading RCW 71.34.351 together with RCW 71.34.355, being treated at an evaluation and treatment facility is distinct from being taken into custody and delivered to an emergency department to address an imminent likelihood of serious harm. Therefore, RCW 71.34.355(1) was not applicable to A.T.[7]

B.      Health Care Provider

A.T. also argues that there was insufficient evidence to support the juvenile court's adjudication on the second count of assault in the third degree because the State failed to present sufficient evidence that Deal was a health care provider as required by the assault in the third degree statute.

To be guilty of assault in the third degree, a person must assault a health care provider performing health care duties at the time of the assault. RCW 9A.36.031(1)(i). A health care provider is "a person regulated under Title 18 RCW and employed by, or contracting with, a hospital licensed under chapter 70.41 RCW." RCW 9A.36.031(1)(i).

Here, Deal testified, and the juvenile court found, that she was a certified nursing assistant employed by the emergency department at the hospital. Chapter 18.88A RCW regulates nursing assistants and identifies "nursing assistant-certified" as a nursing assistant certified under chapter 18.88A RCW. RCW 18.88A.020(8)(a). Therefore, it is a reasonable inference from Deal's testimony that she is a certified nursing assistant that she is a person regulated under Title 18 RCW.

---

[7] A.T. also argues that, even if RCW 71.34.355 does not apply, the hospital staff did not have the legal authority to resort to using physical force to ensure her compliance because RCW 9A.16.020(6) requires imminent danger before enforcing necessary restraint. However, the hospital staff's legal authority to act under RCW 9A.16.020(6) was never raised in front of the juvenile court, and the juvenile court was not required to make findings or conclusions specific to whether the hospital staff used force consistent with RCW 9A.16.020(6). Accordingly, we decline to consider this argument for the first time on appeal. RAP 2.5(a).

Further, multiple witnesses testified that the hospital was an operating hospital. RCW 70.41.090(1) prohibits operating a hospital, or even using the word hospital to identify an institution, if the hospital is not licensed under chapter 70.41 RCW. Because the hospital was operating and identified as a hospital, there is a reasonable inference that the hospital was licensed under chapter 70.41 RCW. Accordingly, there was sufficient evidence that Deal was a health care provider as required to find A.T. guilty of assault in the third degree.

## II.    INTERFERENCE WITH HEALTH CARE FACILITY

A.T. argues that her adjudication on interference with a health care facility should be reversed because there was not sufficient evidence to prove that A.T.'s threats were true threats under the *Counterman* standard.[8] We agree.

RCW 9A.50.020 provides,

> It is unlawful for a person except as otherwise protected by state or federal law, alone or in concert with others, to willfully or recklessly interfere with access to or from a health care facility or willfully or recklessly disrupt the normal functioning of such facility by:
> (1) Physically obstructing or impeding the free passage of a person seeking to enter or depart from the facility or from the common areas of the real property upon which the facility is located;
> (2) Making noise that unreasonably disturbs the peace within the facility;
> (3) Trespassing on the facility or the common areas of the real property upon which the facility is located;
> (4) Telephoning the facility repeatedly, or knowingly permitting any telephone under his or her control to be used for such purpose; or

---

[8] A.T. also argues that RCW 9A.52.020 is unconstitutionally vague as applied to her conduct. A.T. was charged with interfering with a health care facility by "[m]aking noise that unreasonably disturbs the peace within the facility," or by "[t]hreatening to inflict injury on the owners, agents, patients, employees, or property of the facility." RCW 9A.50.020(2), (5). It is unclear from the trial court's findings of fact and conclusions of law whether the trial court adjudicated A.T. guilty based on her threats or her screaming, and the State appears to concede that A.T. was prosecuted based on her threats. Because we reverse A.T.'s adjudication based on insufficient evidence to prove she made true threats, we decline to address A.T.'s argument that RCW 9A.52.020 is unconstitutionally vague.

(5) *Threatening to inflict injury* on the owners, agents, patients, employees, or property of the facility or knowingly permitting any telephone under his or her control to be used for such purpose.

(Emphasis added.) Because the First Amendment to the United States Constitution does not protect true threats of violence, the State must prove a defendant made a true threat in order to convict the defendant of criminal conduct based on threats of violence. *See State v. Kilburn*, 151 Wn.2d 36, 41, 84 P.3d 1215 (2004) (explaining constitutional limitations require that a person may only be convicted of harassment if they made a true threat). "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman*, 600 U.S. at 74 (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003)).

Prior to *Counterman*, the Washington Supreme Court applied a simple negligence standard requiring objective consideration of the reasonable person to determine whether a defendant made a true threat. *State v. Schaler*, 169 Wn.2d 274, 287, 236 P.3d 858 (2010). Whether "'a statement is a true threat or a joke is determined in light of the entire context, and the relevant question is whether a reasonable person in the defendant's place would foresee that in context the listener would interpret the statement as a serious threat or a joke.'" *State v. Trey M.*, 186 Wn.2d 884, 894, 383 P.3d 474 (2016) (quoting *Kilburn*, 151 Wn.2d at 46).

In *Counterman*, the United States Supreme Court held that whether a statement is a true threat depends in part on what the statement conveys to the listener, however, the First Amendment also demanded "a subjective mental-state requirement." 600 U.S. at 75. Therefore, the State must prove the defendant made the threat at least recklessly: "The State must show that the defendant consciously disregarded a substantial risk that [the] communications would be viewed as threatening violence." *Id.* at 69.

The State concedes that the *Counterman* decision applies to A.T.'s case but argues that it presented sufficient evidence to prove that the recklessness standard articulated in *Counterman* was met. We disagree.

Here, there was little to no evidence of A.T.'s subjective state of mind regarding the threats that she made. A.T. testified, but testified only that she did not want to change and began screaming and struggling in order to prevent hospital staff from cutting off her clothes and forcibly changing her into scrubs. A.T. did not testify specifically about the threats that she made to hospital staff. Furthermore, the threats that were shown on the body camera footage were made while A.T. was being forcibly restrained by multiple adults, therefore, it is not reasonable to infer that A.T. consciously disregarded a risk that her statements would actually be viewed as threats to harm hospital staff or kill anyone because there was no opportunity for A.T. to actually accomplish these actions. And although we recognize that A.T. was told that hospital staff had to treat her threats as though they were serious, that is reasonably understood to mean that hospital staff would react to her threats as though they were serious (i.e. call security, restrain her, etc.), not that hospital staff would actually believe her statements to be threatening violence.

Given the specific facts presented here—a minor being detained for mental health issues and resisting hospital staff forcibly restraining her and stripping off her clothes—we cannot say that there was sufficient evidence to establish that A.T. was aware of, and consciously disregarded, a substantial risk that her statements would be viewed as threatening violence. Therefore, there was not sufficient evidence to satisfy the *Counterman* recklessness standard for establishing a true threat. Accordingly, we reverse A.T.'s adjudication for interfering with a health care facility.

III.     DNA COLLECTION FEE

A.T. argues that the $100 DNA collection fee should be stricken from her judgment and sentence. The State does not object to striking the $100 DNA collection fee.

The $100 DNA collection fee is no longer authorized by statute. *See* RCW 43.43.7541. And the State has no objection to remanding for the trial court to strike the $100 DNA collection fee. Accordingly, we remand to the trial court to strike the $100 DNA collection fee.

CONCLUSION

We affirm the juvenile court's adjudication that A.T. is guilty of two counts of assault in the third degree. We reverse the juvenile court's adjudication that A.T. is guilty of interfering with a health care facility. Further, we remand to the juvenile court to strike the $100 DNA collection fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, A.C.J.

We concur:

Maxa, J.

Glasgow, J.